# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

LAURA MARVIN, individually and on
behalf of all others similarly situated,

               *Plaintiffs*,

     v.

THE WINE GROUP, INC. a California
Corporation; The WINE GROUP, LLC,
a California Corporation; SUTTER
HOME WINERY, INC., d/b/a
TRINCHERO FAMILY ESTATES, a
California Corporation; FOLIE A DEUX
WINERY, a California Corporation;
CALIFORNIA NATURAL PRODUCTS,
a California Corporation; REBEL WINE
CO., LLC a California Corporation;
GOLDEN STATE VINTERS, a
California Corporation; VARNI
BROTHERS, CORP., a California
Corporation; TREASURY WINES
ESTATES AMERICAS CO., a California
Corporation; TREASURY WINES
ESTATES HOLDING, INC., a California
Corporation; BERINGER VINEYARDS,
a California Corporation; SEAGLASS
WINE CO., a California Corporation;
CONSTELLATION WINES, US, a
California Corporation; SMITH & HOOK
WINERY CORPORATION, a/k/a
SMITH AND HOOK, a California
Corporation, d/b/a HAHN FAMILY
WINES, a California Corporation;
RAYMOND VINEYARD AND
CELLAR, INC., a California
Corporation; JEAN-CLAUDE BOISSET
WINES, USA, INC., a California
Corporation; FETZER VINEYARDS, a
California Corporation; F. KORBEL &
BROS., INC., a California Corporation;
MEGAN MASON AND RANDY
MASON, d/b/a MASON CELLARS, a
California Corporation; OAKVILLE

Case No.

Judge:

Magistrate:

Demand Jury Trial

WINERY MANAGEMENT CORP., GP,
a California Corporation;
WOODBRIDGE WINERY, INC., a
California Corporation; SIMPLY NAKED
WINERY, a California Corporation;
WINERY EXCHANGE, INC., a
California Corporation; SONOMA WINE
CO., LLC, a California Corporation;
DON SEBASTIANI & SONS
INTERNATIONAL WINE
NEGOCIANTS, CORP., a California
Corporation; and DON SABASTIANI &
SONS INTERNATIONAL WINE
NEGOCIANTS, a California Corporation;
BRONCO WINE COMPANY, a
California Corporation; TRADER JOE'S
COMPANY, a California Corporation,
and DOES 1-200, Inclusive,

*Defendants*.

# CLASS ACTION COMPLAINT

Plaintiff, Laura Marvin, ("hereinafter collectively referred to as Plaintiff"), individually,

and on behalf of all other similarly situated persons (hereinafter "the Class"), by and through

their undersigned counsel, bring this Class Action Complaint against the above named

Defendants, (hereinafter collectively referred to as "Defendants").

## SUMMARY OF THE CASE

1.      Inorganic arsenic is an odorless, colorless, and highly toxic poison known to

cause illness and death when ingested by humans.

2.      California wines are among the most popular and widely consumed wines in the

world. The majority of responsible California wineries, through choice of the proper

grapes/juice, proper filtering processes and the use of proper equipment, limit the amount of

inorganic arsenic present in their wines to "trace" levels considered acceptable (if not completely

safe) for human consumption. However, three separate testing laboratories skilled in arsenic testing have now independently confirmed that several California wineries (including those named as Defendants in this action) instead produce and market wines that contain dangerously high levels of inorganic arsenic, in some cases up to 500% or more than what is considered the maximum acceptable safe daily limit. Put differently, just a glass or two of these arsenic-contaminated wines a day over time could result in dangerous arsenic toxicity to the consumer.

3. Despite the known dangers/risks associated with human ingestion of this highly toxic poison, and despite the fact that the responsible wineries have been able to limit inorganic arsenic levels in their wines to acceptable legal limits through responsible wine making and filtering procedures, the Defendant wineries do not and instead distribute, and or/sell these arsenic-contaminated wines and conceal and do not disclose, warn, or otherwise advise, to their customers or to the ultimate consumers, the existence and/or the dangers/risks posed by the toxic excessive levels of inorganic arsenic contamination in their wine.

4. Defendants' sale of arsenic-contaminated wine violates the laws of all fifty (50) States and Federal laws and standards, poses a risk to the public, and unfairly undercuts those wine makers and sellers who do not make or sell arsenic tainted wines. Responsible California Wineries who do have proper methods and processes in place to reduce inorganic arsenic to acceptable levels are unable to compete at the same price point in the wine market with those wineries who choose instead not to implement the proper methods and processes (and incur the costs thereof) to ensure their wine customers are not exposed to dangerous levels of inorganic arsenic from their contaminated wines.

5. For years, Defendants have long known and/or should have known about the serious health risks posed to their consumers by failing to limit and reduce the amount of highly

toxic inorganic arsenic in the offending wines. Yet instead of reducing the exposure to acceptable levels as responsible wineries have done, Defendants have knowingly and recklessly engaged in a consistent pattern and practice of selling arsenic-contaminated wine to Louisiana consumers, without disclosing either the existence of the toxin in their product, or the health risks it posed, thereby secretly poisoning wine consumers in direct violation of the laws of all 50 States and Federal law.

6.      This is a consumer class action that seeks, among other things, injunctive relief, civil penalties, disgorgement, and damages to remedy several years of Defendants' negligent, reckless and/or knowing sale of inorganic arsenic contaminated wines, as well as Defendants' failure to warn wine consumers of the existence of, and dangerous/risks associated with, consuming inorganic arsenic when they drink Defendants' contaminated wines. Plaintiffs, further allege that Defendants are also in violation of the laws of all 50 States and Federal law for the years prior and subsequent to the vintage identified for each wine as provided herein.

7.      It has been known, at least since 1987, that exposure to inorganic arsenic causes cancer and causes and/or contributes to a hose of other debilitating/fatal diseases. This action further seeks to remedy Defendants' unfair, misleading and deceptive conduct, and to ensure that all wine consumers are, at the very least, warned that they are being exposed to toxic levels of inorganic arsenic before purchasing and/or consuming any of the Defendants' wine.

**PARTIES**

8.      Plaintiff is a resident of Baton Rouge, Louisiana.

9.      Defendants The Wine Group, Inc., and The Wine Group, LLC, (collectively, "Franzia") sell and/or distribute wine in Louisiana and throughout the United States. The Wine Group, Inc., is a parent company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California; and the Wine Group, LLC, is a limited liability company, with its

principal place of business located at 4596 South Tracy Blvd., Tracy, California. Franzia defendants sell, distributed and/or sold the following varietals of **Franzia** wine: *Vintner Select White Grenache, White Zinfandel, Vintner Select White Merlot, and Vintner Select Burgundy.*

10.     Defendants Sutter Home Winery, Inc., d/b/a, Trinchero Family Estates and Folie a Deux Winery (collectively, "Ménage à Trois") sell and/or distribute wine in Louisiana and throughout the United States. Sutter Home Winery, Inc., d/b/a, Trinchero Family, is a parent company, with its principal place of business located at 100 St. Helena Highway South Street, Helena, California; and Folie a Deux Winery, is a subsidiary company, with its principal place of business located at 7481 St. Helena Highway, Oakville California. Ménage à Trois defendants sell, distributed and/or sold the following varietals of **Ménage à Trois** wine: *Pinot Grigio, Moscato, White Blend, Chardonnay, Rose, Cabernet Sauvignon, and California Read Wine.*

11.     Defendants Sutter Home Winery, Inc., d/b/a, Trinchero Family Estates and California Natural Products (collectively, "Wine Cube") sell and/or distribute wine in Louisiana and throughout the United States. Sutter Home Winery, Inc., d/b/a, Trinchero Family, is a parent company, with its principal place of business located at 100 St. Helena Highway South Street, Helena, California; and California Natural Products, a subsidiary company, with its principal place of business located at 1250 East Lathrop Road, Lathrop, California. Wine Cube defendants sell, distributed and/or sold the following varietals of **Wine Cube** wine: *Moscato, Pink Moscato, Pinot Grigio, Chardonnay, Red Sangria, Sauvignon Blanc, and Cabernet Sauvignon/Shiraz.*

12.     Defendants Sutter Home Winery, Inc., d/b/a, Trinchero Family Estates, Rebel Wine Co., LLC, and California Natural Products (collectively, "Bandit") sell and/or distribute wine in Louisiana and throughout the United States. Sutter Home Winery, Inc., d/b/a, Trinchero Family, is a parent company, with its principal place of business located at 100 St. Helena

Highway South Street, Helena, California; Rebel Wine, is a subsidiary company, with its principal place of business located at 100 St. Helena Highway South Street, Helena, California; and California Natural Products, is a subsidiary company, with its principal place of business located at 1250 East Lathrop Road, Lathrop, California. Bandit defendants sell, distributed and/or sold the following varietals of **Bandit** wine: *Pinot Grigio, Chardonnay, and Cabernet Sauvignon.*

13.      Defendants Sutter Home Winery, Inc., d/b/a, Trinchero Family Estates, and California Natural Products (collectively, "Sutter Home") sell and/or distribute wine in Louisiana and throughout the United States. Sutter Home Winery, is a parent company, with its principal place of business located at 100 St. Helena Highway South Street, Helena, California; and California Natural Products is a subsidiary company, with its principal place of business located at 1250 East Lathrop Road, Lathrop, California. Sutter Home defendants sell, distributed and/or sold the following varietals of **Sutter Home** wine: *Sauvignon Blanc, Gewurztraminer, Pink Moscato, Pinot Grigio, Moscato, Chenin Blanc, Sweet Red, Riesling, White Merlot, Merlot, White Zinfandel, and Zinfandel.*

14.      Defendants The Wine Group, Inc., and The Wine Group, LLC (collectively, "Mogen David") sell and/or distribute wine in Louisiana and throughout the United States. The Wine Group, Inc., is a parent company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California; The Wine Group, LLC, is a limited liability company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California. Mogen David defendants sell, distributed and/or sold the following varietals of **Mogen David** wine: *Concord, and Blackberry Wine.*

15.     Defendants The Wine Group, Inc., and The Wine Group, LLC (collectively, "Concannon") sell and/or distribute wine in Louisiana and throughout the United States. The Wine Group, Inc., is a parent company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California; The Wine Group, LLC, is a limited liability company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California. Cocannon defendants sell, distributed and/or sold the following varietals of **Cocannon** wine: *Glen Ellen Reserve Pinot Grigio, Selected Vineyards Pinot Noir, and Glen Ellen Reserve Merlot.*

16.     Defendants The Wine Group, Inc., and The Wine Group, LLC and Varni Brothers, Corp. (collectively, "Flipflop") sell and/or distribute wine in Louisiana and throughout the United States. The Wine Group, Inc., is a parent company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California; The Wine Group, LLC, is a limited liability company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California; and Varni Brothers Corp., is a company, with its principal place of business located at 400 Hosmer Ave., Modesto, California. Flipflop defendants sell, distributed and/or sold the following varietals of **Flipflop** wine: *Pinot Grigio, Moscato, and Cabernet Sauvignon.*

17.     Defendants Treasury Wines Estates Americas Co., Treasury Wines Estates Holding, Inc. and Beringer Vineyards (collectively, "Beringer") sell and/or distribute wine in Louisiana and throughout the United States. Treasury Wines Estates Americas Co., is a parent company, with its principal place of business located at 610 Air Park Road, Napa, California; Treasury Wines Estates Holding, Inc., is an ultimate parent company, with its principal place of business located at PO Box 4500, Napa, California; and Beringer Vineyards, is a company, with its principal place of business located at 2000 Main St., St. Helena, California. Beringer

defendants sell, distributed and/or sold the following varietals of **Beringer** wine: *White Merlot, White Zinfandel, Red Moscato, and Refreshingly Sweet Moscato.*

18.     Defendants Sutter Home Winery, Inc., d/b/a, Trinchero Family Estates, and SeaGlass Wine Co. (collectively, "SeaGlass") sell and/or distribute wine in Louisiana and throughout the United States. Sutter Home Winery, Inc., d/b/a, Trinchero Family, is a parent company, with its principal place of business located at 100 St. Helena Highway South Street, Helena, California; and SeaGlass Wine Co. is a company, with its principal place of business located at PO Box 248, St. Helena, California. SeaGlass defendants sell, distributed and/or sold the following varietals of **SeaGlass** wine: *Sauvignon Blanc*.

19.     Defendants The Wine Group, Inc., and The Wine Group, LLC (collectively, "Tribuno") sell and/or distribute wine in Louisiana and throughout the United States. The Wine Group, Inc., is a parent company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California; The Wine Group, LLC, is a limited liability company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California. Tribuno defendants sell, distributed and/or sold the following varietals of **Tribuno** wine: *Sweet Vermouth.*

20.     Defendants Constellation Wines, US and Smith & Hook Winery Corporation, a/k/a Smith and Hook, d/b/a Hahn Family Wines (collectively, "HRM Rex-Goliath") sell and/or distribute wine in Louisiana and throughout the United States. Constellation Wines, US, is a company, with its principal place of business located at 801 Main Street, St. Helena, California; Hahn Family Wines, is a company, with its principal place of business located at 700 California Boulevard, Napa, California; and Smith & Hook Winery Corporation, a/k/a Smith and Hook, is a company, with its principal place of business located at 37700 Foothill Road (Drawer C),

Soledad, California. HRM Rex-Goliath defendants sell, distributed and/or sold the following varietals of **HRM Rex-Goliath** wine: *Moscato*.

21.     Defendant Fetzer Vineyards (individually, "Fetzer") sells and/or distributes wine in Louisiana and throughout the United States. Fetzer Vineyards, is a subsidiary, with its principal place of business located at 12901 Old River Road, Hopland, California. Defendant Fetzer sells, distributed, and/or sold the following varietals of Fetzer wine: Moscato, and Pinot Grigio.

22.     Defendant F. Korbel & Bros., Inc., (individually, "Korbel") sells and/or distributes wine in Louisiana and throughout the United States. F. Korbel & Bros., Inc., is a company, with its principal place of business located at 13250 River Road, Guerneville, California. Defendant Korbel sells, distributed, and/or sold the following varietals of **Korbel** wine: *Sweet Rose Sparkling Wine, and Extra Dry Sparkling Wine.*

23.     Defendants The Wine Group, Inc., and The Wine Group, LLC (collectively, "Corbett Canyon") sell and/or distribute wine in Louisiana and throughout the United States. The Wine Group, Inc., is a parent company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California; The Wine Group, LLC, is a limited liability company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California. Corbett Canyon defendants sell, distributed and/or sold the following varietals of **Corbett Canyon** wine: *Pinot Grigio, and Cabernet Sauvignon.*

24.     Defendants Megan Mason and Randy Mason, d/b/a Mason Cellars and Oakville Winery Management Corp., GP (collectively, "Pomelo") sell and/or distribute wine in Louisiana and throughout the United States. Megan Mason and Randy Mason, d/b/a Mason Cellars, is a parent company, with its principal place of business located at 5 Heritage Court, Yountville,

California; and Oakville Winery Management Corp., is a company, with its principal place of business located at PO Box 434, Oakville, California. Pomelo defendants sell, distributed and/or sold the following varietals of **Pomelo wine**: *Sauvignon Blanc*.

25. Defendants Constellation Wines, US, Woodbridge Winery, Inc., and Simply Naked Winery (collectively, "Simply Naked") sell and/or distribute wine in Louisiana and throughout the United States. Constellation Wines, US, is a company, with its principal place of business located at 801 Main Street, St. Helena, California; Woodbridge Winery, Inc., is a company, with its principal place of business located at 1649 E Victor Rd, 1C, Lodi, California; and Simply Naked Winery, is a company, with its principal place of business located in Acampo, California. Simply Naked defendants sell, distributed and/or sold the following varietals of **Simply Naked** wine: *Moscato*.

26. Defendants Winery Exchange, Inc., and Sonoma Wine Co., LLC (collectively, "Acronym") sell and/or distribute wine in Louisiana and throughout the United States. Winery Exchange, Inc., is a company, with its principal place of business located at 500 Redwood Blvd., Ste. 200, Novato California; and Sonoma Wine Co., LLC, is a limited liability company, with its principal place of business located at 9119 Graton Road, Graton, California. Acronym defendants distributed and/or sold the following varietals of **Acronym** wine: *Gr8rw Red Blend*.

27. Defendants Constellation Wines, US and California Natural Products (collectively, "Vendange") sell and/or distribute wine in Louisiana and throughout the United States. Constellation Wines, US, is a company, with its principal place of business located at 801 Main Street, St. Helena, California; and California Natural products, upon information and belief, is a company, with its company, with its principal place of business located at 1250 East

Lathrop Road, Lathrop California. Vendange defendants distributed and/or sold the following varietals of **Vendange** wine: *Merlot; White Zinfandel*.

28.     Defendant Constellation Wines, US (individually, "Cooks") sells and/or distributes wine in Louisiana and throughout the United States. Constellation wines, US, is a company, with its principal place of business located at Main Street, St. Helena, California. Cooks defendant distributed and/or sold the following varietals of **Cooks** wine: *Spumante*.

29.     Defendants The Wine Group, Inc., The Wine Group, LLC, Constellation Wines, US, (collectively, "Almaden") sell and/or distribute wine in Louisiana and throughout the United States. The Wine Group, Inc., is a parent company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California; The Wine Group, LLC, is a limited liability company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California; and Constellation Wines, US, is a company, with its principal place of business located at 801 Main Street, St. Helena, California. Almaden defendants distributed and/or sold the following varietals of **Alamaden** wine: *Heritage White Zinfandel; Heritage Moscato; Heritage Chardonay; Mountain Burgundy; Mountain Rhine; Mountain Chablis*.

30.     Defendants The Wine Group, Inc., and The Wine Group, LLC, (Collectively, "Oak Leaf") sell and/or distribute wine in Louisiana and throughout the United States. The Wine Group, Inc., is a parent company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California; and The Wine Group, LLC, is a limited liability company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California. Oak Leaf defendants distributed and/or sold the following varietals of **Oak Leaf** wine: *White Zinfandel*.

31.     Defendants The Wine Group, Inc., and The Wine Group, LLC, (collectively, "Foxhorn") sell and/or distribute wine in Louisiana and throughout the United States. The Wine

Group, Inc., is a parent company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California; and The Wine group, LLC, is a limited liability company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California. Foxhorn defendants distributed and/or sold the following varietals of **Foxhorn** wine: *White Zinfandel*.

32.     Defendants the Wine group, Inc., and The Wine Group, LLC, (collectively, "Trapiche") sell and/or distribute wine in Louisiana and throughout the United States. The Wine Group, Inc., is a parent company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California; and The Wine Group, LLC, upon information and belief, is a limited liability company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California. Trapiche defendants distributed and/or sold the following varietals of **Trapiche** wine: *Malbec*.

33.     Defendants the Wine Group, Inc., The Wine Group, LLC, and Golden State Vintners (collectively, "Fisheye") sell and/or distribute wine in Louisiana and throughout the United States and the world. The Wine Group, Inc., is a parent company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California; The Wine Group, LLC, is a limited liability company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California; and Golden State Vintners, is a parent company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California. Fisheye defendants distributed and/or sold the following varietals of **Fisheye** wine: *Pinot Grigio*.

34.     Defendants The Wine Group, Inc., and The Wine Group, LLC, (Collectively, "Bay Bridge") sell and/or distribute wine in Louisiana and throughout the United States. The Wine Group, Inc., is a parent company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California; and The Wine Group, LLC, is a limited liability company, with

its principal place of business located at 4596 South Tracy Blvd., Tracy, California. Bay Bridge defendants distributed and/or sold the following varietals of **Bay Bridge** wine: *Chardonay*.

35.     Defendants The Wine Group, Inc., and The Wine Group, LLC, (Collectively, "Cupcake") sell and/or distribute wine in Louisiana and throughout the United States. The Wine Group, Inc., is a parent company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California; and The Wine Group, LLC, is a limited liability company, with its principal place of business located at 4596 South Tracy Blvd., Tracy, California. Cupcake defendants distributed and/or sold the following varietals of **Cupcake** wine: *Malbec*.

36.     Defendants Treasury Wines Estates Americas Co., and Treasury Wines Estates Holding, Inc., (Collectively, "Colores Del Sol") sell and/or distribute wine in Louisiana and throughout the United States. Treasury Wines Estates Americas Co., is a parent company, with its principal place of business located at 610 Air Park Road, Napa, California; and Treasury Wines Estates Holding, Inc., is an ultimate parent company, with its principal place of business located at PO Box 4500, Napa, California. Colores Del Sol defendants distributed and/or sold the following varietals of **Colores Del Sol** wine:  *Malbec*.

37.     Defendant Winery Exchange, Inc., (individually, "Arrow Creek") sells and/or distributes wine in Louisiana and throughout the United States. Winery Exchange, Inc., is a company, with its principal place of business located at 500 Redwood Blvd., Ste. 200, Novato, California. Defendant Arrow Creek distributed and/or sold the following varietals of **Arrow Creek** wine: *Coastal Series Cabernet Sauvignon*.

38.     Defendant Winery Exchange, Inc., (individually, "Hawkstone") sells and/or distributes wine in Louisiana and throughout the United States. Winery Exchange, Inc., is a company, with its principal place of business located at 500 Redwood Blvd., Ste. 200, Novato,

California. Defendant Hawkstone defendant distributed and/or sold the following varietals of **Hawkstone** wine: *Cabernet Sauvignon*.

39.    Defendant Constellation Wines, US, (individually, "Richards Wild Irish Rose") sells and/or distributes wine in Louisiana and throughout the United States. Constellation Wine, US, is a company, with its principal place business located at 801 Main Street, St. Helena, California. Richard Wild Irish Rose defendant distributed and/or sold the following varietals of **Richard Wild Irish Rose** wine: *Red Wine*.

40.    Defendants Don Sebastiani & Sons International Wine Négociants, Corp., and Don Sebastiani & Sons International Négociants (Collectively, "Smoking Loon") produce, manufacture, sell and/or distribute wine in Louisiana and throughout the United States. Don Sebastiani & Sons International Wine Négociants, Corp., is a company, with its principal place of business located at 485 1st West, Sonoma, California; and Don Sebastiani & Sons International Wine Négociants, is a parent company, with its principal place of business located at 520 Airport Road, Napa, California. Smoking Loon defendants distributed and/or sold the following varietals of **Smoking Loon** wine: *Viognier*.

41.    Defendants Bronco Wine Company, and Trader Joe's Company (collectively, "Charles Shaw") sell and/or distribute wine in Louisiana and throughout the United States. Bronco Wine Company, is a parent company, with its principal place of business located at 6342 Bystrum Road, Ceres, California; and Trader Joe's Company, is a company, with its principal place of business located at 800 S, Shamrock Ave., Monrovia, California. Charles Shaw defendants distributed and/or sold the following varietals of **Charles Shaw** wine: *White Zinfandel*.

42. Defendants Jean-Claude Boisset Wines, USA Inc., and Raymond Vineyard and Cellar/Raymond Vineyard and Cellar, Inc., (Collectively, "R. Collection by Raymond") sell and/or distribute wine in Louisiana and throughout the United States and the world. Jean-Claude Boisset Wines, USA Inc., is a subsidiary company, with its principal place of business located at 849 Zinfandel Lane, Saint Helena, California; and Raymond Vineyard and Cellar/Raymond Vineyard and Cellar, Inc., are subsidiary companies, with their principal place of business located at 849 Zinfandel Lane, Saint Helena, California. R. Collection by Raymond defendants distributed and/or sold the following varietals of **R. Collection by Raymond** wine: *Chardonay*.

43. Plaintiffs are currently ignorant of the true names and capacities, whether individual, corporate, associate, or otherwise, of the defendants sued herein under the fictitious names Does 1 through 200, inclusive and therefore sue such defendants by such fictitious names. Plaintiff will amend this complaint to allege the true names and capacities of said fictitiously named defendants when their true names and capacities have been ascertained. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Doe defendants are legally responsible is some manner for the events and occurrences alleged herein, and for the damages suffered by Plaintiffs and members of the Class.

44. As sued herein, "Defendants" shall mean the above-named Defendants, including all entities through which they do business and its predecessors, successors, affiliates, representatives, attorneys, employees, and/or assigns who, in concert and/or acting as agents for one another engaged in the conduct complained of herein.

### JURISDICTION AND VENUE

45. This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005 because the matter in

controversy exceeds $5,000,000, exclusive of interest and costs, because the proposed Class consists of 100 or more members, and minimal diversity exists.

46. This Court has personal jurisdiction over the Defendants because they are authorized to do business and in fact do business in this district and have sufficient minimum contacts with this district, and/or each Defendant otherwise intentionally avails itself of the markets in this state through the promotion, marketing and sale of its wine products in this district, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

47. Venue is proper in this District pursuant to 28 U.S.C. § 139(b)(2) and (3) because a substantial part of the events or omissions giving rise to these claims occurred in this District, and Defendants are subject to the Court's personal jurisdiction with respect to this action.

**FACTS RELEVANT TO ALL CLAIMS.**

48. According to the Wine Institute, in 2013, California wine shipments within the United States alone were 215 million cases – 2,580,000,000 bottles of wine with an estimated retail value of $23.1 billion.

49. California wineries typically do not disclose the ingredients or chemicals (beyond alcohol content and sulfites) that are present in the wine they are selling. Moreover, no government regulatory agency is regularly monitoring or testing these wines to ensure they are free from toxic poisons that could sicken or kill consumers over time. Specifically, no government agency is regularly testing wine for toxic ingredients such as inorganic arsenic, leaving the wineries to police their own wines, and wine consumers to fend for themselves, without regulatory protection or the necessary warnings to make an informed decision.

50.     Wine may contain both organic and inorganic arsenic. Of these, inorganic arsenic is substantially more toxic and dangerous to humans. Based upon independent sample testing on the wines at issue in this complaint, inorganic arsenic makes up the overwhelming majority of the arsenic in these wines. Inorganic arsenic is: (1) acutely toxic when introduced into the human body; (2) proven to cause cancer; (3) known to cause and contribute to a host of debilitating illness, and (4) when consumed over time, increases the likelihood of early death. The World Health Organization classifies inorganic arsenic as a "MAJOR PUBLIC HEALTH CONCERN." Ingestion of arsenic can cause nausea, vomiting abdominal pain, severe diarrhea, disturbances of the cardiovascular and nervous systems, and eventual death Chronic arsenic toxicity results in multi-system disease and has been linked to a variety of dermal symptoms (exfoliate dermatitis, keratosis, vitiligo, skin cancer), peripheral neuropathy, encephalopathy, bronchitis, pulmonary fibrosis, portal hypertension, peripheral vascular disease/"black foot disease," atherosclerosis, various cancers (including skin, bladder, lung, liver, kidney, nasal, passage, prostate and colon cancer) and diabetes mellitus.

51.     Along with alarming carcinogenicity of arsenic and its implication in multiple cancers (including skin, bladder, lung, liver, kidney, nasal passages, prostate and colon), comes the very real concern which has been identified in medical literature between arsenic toxicity, type 2 diabetes mellitus and obesity. This association is of the utmost importance, as incidence and prevalence of type 2 diabetes and obesity have reached epidemic proportions representing a public health emergency. Specifically, the U.S. Center for Disease Control projects that 1 in 3 of children born in the year 2000 will become diabetic in their lifetime, and 1 in 2 among Hispanic females.

52.     While inorganic arsenic is considered to be more toxic than organic arsenic, several methyl and phenyl derivatives of arsenic such as monomethylarsonic acid (MMA), and dimethyl arsenic acid (DMA) are of possible health concern as per the Agency for Toxic Substances and Disease Registry (ATSDR) 2007 Toxicological Profile for Arsenic (1). The International Agency for Research on Cancer has classified arsenic as a Class I Human carcinogen. The U.S. Environmental Protection Agency clearly states that the maximum contaminant level goal (MCLG) for any arsenic is zero, based on the best available science to prevent potential health problems. The resulting maximum contaminant level (MCL), which represents the enforceable target level for arsenic in water, considers cost and feasibility and was set at 10 ppb. Of note, this measurement is for total arsenic and does not consider or require any specification analysis of organic versus inorganic.

53.     Defendants manufacture and/or distribute wines labeled, marketed and intended for immediate human consumption (without being made a constituent or ingredient of another product, nor requiring substantial additional preparation), including but not limited to the wines referenced herein. These wines are distributed and/or sold in all 50 States, including Louisiana.

54.     Defendants distribute and sell wine in all 50 States, including Louisiana that contains inorganic arsenic in amount far in excess of what is allowed in drinking water. Defendants do not warn that their products contain unsafe amounts of inorganic arsenic, nor do they disclose even the existence of inorganic arsenic in the wine. Consequently, Defendants' wine consumers have been made unwitting "guinea pigs" of arsenic exposure, being involuntary exposed to toxic levels of inorganic arsenic over and over again by the Defendants. Even today, with the sophisticated testing equipment available to wine makes and distributors, Defendants

still conceal and/or refuse to warn the typical wine consumer about the true risks they are taking by ingesting and consuming their product.

55.     The wines at issue in this case contain toxic inorganic arsenic at levels that exceed California standards, resulting in human ingestion/exposure to Class I carcinogens without any disclosure or warning to the consumer.

56.     Inorganic arsenic has long been known to be toxic to humans and acceptable limits of inorganic arsenic in food and drink have been repeatedly lowered over the years. It is now well understood that even very small amounts of inorganic arsenic can be harmful to humans.

57.     During the four years preceding the filling of this complaint, Defendants sold, and Plaintiffs and the other members of the Class purchased Defendants' wine, described above.

58.     Plaintiffs and other similarly situated consumers bought the wine primarily for personal, family, or household purchases. Defendants know and intend that individuals will consume their wines.

59.     The named Defendants sell and distribute wine to consumers at inorganic arsenic levels significantly higher than what the State of California considers the maximum acceptable limit for safe daily exposure.

60.     Each of the Defendants sells and/or distribute wine containing toxic levels of inorganic arsenic, yet Defendants have failed, and continue to fail, to comply with state health law standards or to provide the wine consumer with any warning of this fact. Defendants actually knew and/or should have known of the toxic levels of inorganic arsenic in their wines, yet continued to manufacture and/or distribute their toxic wine without disclosing or warning of that fact, instead actively concealing such information from the general public.

61.    Defendants' marketing and advertising of their wines was, and continues to be unfair, untrue, deceptive and misleading. This conduct includes, but is not limited to:

(a)    Failing to warn that Defendants' wine contains inorganic arsenic, a chemical known to cause cancer and other serious illnesses;

(b)    Failing to warn that Defendants' wine contains levels of inorganic arsenic widely considered to be unsafe and inappropriate for human consumption;

(c)    Representing to Plaintiffs and similarly situated consumers and the general public that Defendants' wine were safe and fit for human use, knowing that said representations were false, and concealing from Plaintiffs and similarly situated consumers and the general public that its wine contains inorganic arsenic;

(d)    Engaging in advertising programs designed to create the image, impression and belief by consumers that Defendants' wines are safe and fit for human use, even though Defendants knew this to be false, and even though Defendants' had no reasonable grounds to believe them to be true; and

(e)    Purposefully downplaying and understanding the health hazards and risks associated with Defendants' wines.

62.    Defendants could have taken measures to limit or reduce the amount of inorganic arsenic levels in the offending wines to allowable levels, but did not do so in order to enjoy additional profits at the expense of the wine consumer.

63.     But for Defendants' unfair, untrue, deceptive and misleading conduct, Defendants would not have been able to sell the wine and Plaintiffs and other similarly situated consumers would not have purchased the wine.

64.     But for Defendants' unfair untrue, deceptive and misleading conduct, Defendants would have to warn consumers of the inorganic arsenic in its wine or take steps in the manufacturing of the wine to prevent unsafe levels of inorganic arsenic from getting into the wine or to reduce the unsafe levels of inorganic arsenic in the wine.

65.     Plaintiffs and all other consumers similarly situated are therefore entitled to damages and full restitution of their purchase of Defendants' wines. All Plaintiffs, and all others similarly situated are also entitled to injunctive relief to prevent the continued sale of wine with excessive levels of inorganic arsenic. In addition, all consumers of Defendants' wines who were denied the ability to make a knowing choice as to whether to purchase the wines with excessive levels of inorganic arsenic should be refunded the full purchase price of the wines.

66.     As a result of Defendants' conduct described above, Plaintiffs and the Class have in fact suffered economic injuries and lost money, including the purchase price of the wine, as described herein.

67.     The safe harbor doctrine will not shield Defendants from liability.  The safe harbor provision states, "the relevant analysis…is whether…the moving party has demonstrated that a specific federal or state law affirmatively authorized it to engage in the conduct alleged…not whether [the plaintiffs] have demonstrated that [the defendants'] conduct violates a specific rule or regulation." *State of Fla., Office of Atty. Gen., Dep't of Legal Affairs v. Tenet Healthcare Corp.,* 420 F. Supp. 2d 1288, 1310 (S.D. Fla. 2005) (emphasis added). To succeed, Defendants must demonstrate that federal or state law permits the specific

practice at issue; it is not sufficient for the defendants merely to show that the federal or state government, or an agency thereof, has regulated generally in the area. *See Peters v. Keyes Co.*, No. 10-60162-CIV, 2010 WL 1645095, at *4 (S.D. Fla. Apr. 21, 2010).

68.     The "safe harbor" defense does not apply to federal actions, which does not rise to the level of federal law, much in the same way as preemption.  *See In re Horizon Organic milk Plus DHA Omega-3 Marketing and Sales Practice Litigation*, 955 F.Supp.2d 1311, 1347.  ("The FDA's statement that "[b]ased on the information [WhiteWave has] provided, [the FDA] *would not object at this time to the DHA claims* regarding brain and eye health … does not constitute approval of WhiteWave's brain health representations by the FDA.  Moreover, even if the letter could be construed as approval, statements made by the FDA in a letter to a corporation about its products are insufficient to accord those statements the weight of federal law to invoke the safe harbor provisions of the consumer fraud statute.") (*Emphasis in original).*

69.     The TTB has made clear that an "approval" of a label does not mean the label is in "compliance" with all TTB regulations.  The TTB's mission is to protect the public which includes ensuring that labels on alcohol beverages contain adequate descriptive information and are not likely to mislead consumers.

70.     Established in 2008, TTB's Alcohol Beverage Sampling Program (ABSP) is a random survey of products in the marketplace to evaluate our success in meeting this mission and to determine where compliance issues exist. [1]  Each year the TTB conducts the ABSP by purchasing products from the marketplace and brings them to their offices for label assessments to determine if products are in compliance with its own labeling regulations. Following the label assessments, the TTB sends the products to their laboratories to undergo a series of analyses to determine compliance with certain information displayed on the product labels. *Id.*

---

[1] http://ttb.gov/sampling/index.shtml
[2] http://ttb.gov/pdf/2015-01-07-fy2014-results.pdf

71.     In 2014, the TTB selected 190 distilled spirits, 155 malt beverages, and 105 wines for the 2014 ABSP, with 450 total products included in the survey. After analyzing these products, the TTB found 139 products that were non-compliant. By commodity, the TTB found that 73 distilled spirits products, 46 malt beverage products, and 20 wine products were non-compliant with current TTB regulations, even though these labels were initially "approved" by the TTB. [2]

72.     In 2013, the TTB selected 275 distilled spirits, 239 malt beverages, and 154 wines for the 2013 ABSP, with 668 total products included in the survey. After analyzing these products, the TTB found 190 products that were non-compliant. By commodity, the TTB found that 80 distilled spirits products, 73 malt beverage products, and 37 wine products were non-compliant, even though these labels were initially "approved" by the TTB. [3]

73.     In 2012, the TTB selected 246 distilled spirits, 206 malt beverages, and 196 wines for the 2012 ABSP, with 642 total products included in the survey.  After analyzing these products, we found 158 products that were non-compliant. By commodity, we found that 85 distilled spirits products, 40 malt beverage products, and 33wine products were non-compliant, even though these labels were initially "approved" by the TTB. [4]

## CLASS ACTION ALLEGATIONS

74.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following class:

> All persons in the United States who, within the Class Period, purchased Defendants' wine products and brands as identified herein (the "Class").

---

[2] http://ttb.gov/pdf/2015-01-07-fy2014-results.pdf
[3] http://ttb.gov/pdf/2014-02-10-fy2013-results.pdf
[4] http://ttb.gov/pdf/2012absp-results.pdf

75.     Alternatively, Plaintiff brings this action on behalf of the following sub-class: All persons in Louisiana who, within the Class Period, purchased Defendants' wine products and brands as identified herein.

76.     The following persons are expressly excluded from the Class: (1) Defendants and their subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

77.     This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

78.     **Numerosity:** Based upon Defendants' publicly available sales data with respect to Defendants' wine, it is estimated that the Class numbers are potentially in the millions, and the joinder of all Class members is impracticable.

79.     **Common Questions Predominate:** The action involves common questions of law and fact applicable to each Class member that predominate over questions that affect only individual Class members. Thus, proof of a common set of facts will establish the right to each Class member to recover. Questions of law and fact common to each Class member include, for example:

a.      Whether Defendants engaged in unfair, unlawful or deceptive business practices by failing to properly package and label Defendants' wine sold to consumers;

b.      Whether the product at issue is misbranded or unlawfully packaged and labeled as a matter of law;

c.      Whether Defendants made unlawful and misleading claims regarding Defendants' wine;

d.      Whether Defendants violated Louisiana Deceptive and Unfair Trade Practice Act, §51:1401 et seq.; Louisiana Redhibition Civil Code Art. 2520 et seq.; Magnuson-Moss Warranty Act; Breach of Implied and/or Express Warranties; or the FDCA and regulations promulgated thereunder;

e.      Whether Plaintiffs and the Class are entitled to equitable and/or injunctive relief;

f.      Whether Defendants' unlawful, unfair and/or deceptive practices harmed Plaintiffs and the Class; and

g.      Whether Defendants were unjustly enriched by their deceptive practices.

80.      **Typicality:** Plaintiffs' claims are typical of the claims of the Class because Plaintiffs purchase Defendants' products during the Class Period. Defendants' unlawful, unfair, and fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. The injuries of each member of the Class were caused directly by Defendants' wrongful conduct. In addition, the factual underpinning of Defendants' misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the Class members and a based on the same legal theories.

81.      **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Class. Neither Plaintiffs nor their counsel have any interests that conflict with or are antagonistic to the interests of the Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the members of the Class. Plaintiffs and their counsel have the necessary resources to adequately and vigorously litigate this class action, and Plaintiffs and their counsel are aware of their fiduciary responsibilities to the Class members

and will diligently discharged those duties by vigorously seeking the maximum possible recovery for the Class.

82. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class members' rights and the disposition of their interests through actions to which they are not parties. Class Action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would create. Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

83. The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2), are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate injunctive or equitable relief with respect to the Class as a whole.

84. The prerequisites to maintaining a class action pursuant to Fed R. Civ. P. 23(b)(3) are met as questions of law or fact common to class members, predominate over any questions

affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

85.     Plaintiffs and their counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

86.     Plaintiffs are members of the Class they seek to represent.  Plaintiffs' claims are typical of the Class members' claims. Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' claims are typical and representative of the Class.

87.     There are no unique defenses which may be asserted against Plaintiffs individually, as distinguished from the Class. The claims of Plaintiffs are the same as those of the Class.

88.     No conflicts of interest exist between Plaintiffs and the other Class members. Plaintiffs have retained counsel that is competent and experienced in complex class action litigation. Plaintiffs and their counsel will fairly and adequately represent and protect the interests of the Class.

89.     This class action is superior to any other method for the fair and efficient adjudication of this dispute.

## CAUSES OF ACTION
### COUNT I
### VIOLATION OF LOUISIANA CONSUMER PROTECTION
### STATUTES §51:1401, LOUISIANA DECEPTIVE
### AND UNFAIR TRADE PRACTICES ACT
### (Louisiana Class Only)

90.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 93 above as if fully set forth herein.

91.     Defendants' conduct of intentionally concealing material facts regarding arsenic levels in its wine constitutes unlawful, unfair and deceptive business acts and trade practices.

92.     Defendants sold its wine products in Louisiana and throughout the United States during the Class Period.

93.     Louisiana Consumer Protection Statue 51:1401 et seq., prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising. For the reasons discussed above, Defendant has engaged in unfair, false, deceptive, untrue and misleading advertising in violation of La. R.S. 51:1401 et seq.

94.     The Louisiana Deceptive and Unfair Trade Practices Act also prohibits any, "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in conduct of any trade or commerce." Defendant has violated La. R.S. 51:1401's prohibition against engaging in unlawful acts and practices by, *inter alia,* making the false and deceptive representations, and also through its omissions of material facts, as set forth more fully herein, and violating 21 U.S.C. §342, 21 U.S.C. §343, 21 U.S.C. §379aa-1, 15 U.S.C. §45 (a)(I), 49 Fed. Reg. 30999 (Aug. 2, 1984), Federal Food, Drug and Cosmetic Act §402(f)(1)(A), and the common law.

95.     Plaintiffs and the Class reserve the right to allege other violations of law which constitute other unlawful business acts or practices. Such conduct is ongoing to this date.

96.     Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of The Louisiana Deceptive and Unfair Trade Practices Act, La. R.S. 51:1401, in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive

and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributed to such conduct.

97. As stated in this Complaint, Plaintiffs allege violations of consumer protection, unfair competition, and truth-in-advertising laws in Louisiana resulting in harm to consumers. Defendant's conduct constitutes violations of the public policies against engaging in false and misleading advertising, unfair competition and deceptive conduct towards consumers as proscribed by Louisiana Deceptive and Unfair Trade Practices Act, La. R.S. 51:1401.

98. Defendants intended to deceive consumers about the arsenic levels in its wine products that exceed EPA standards for drinking water.

99. Defendants' intentional concealment of material facts are likely to mislead a consumer acting reasonably in the circumstances into believing that the Defendants' product safe for consumption.

100. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

101. Defendant's claims, nondisclosures and misleading statements, as more fully set forth above and collectively as a scheme, were false, misleading and likely to deceive the consuming public within the meaning of Louisiana Deceptive and Unfair Trade Practices Act.

102. Defendant's deceptive conduct constitutes a prohibited practice, which directly and proximately caused and continues to cause substantial injury to Plaintiffs and the other Class members. Plaintiffs and Class members have suffered injury in fact, actual damages, and have lost money as a result of Defendant's unlawful, unfair and fraudulent conduct. Plaintiffs' damages are the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered

according to the contract of the parties. Defendant's deceptively labeled, and falsely advertised, and misbranded products have little to no market value.

103. Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

104. FDUTPA's safe harbor provision protects companies from consumer fraud suits resulting from attempts to comply with other state and federal laws. It does not protect companies who receive the blessing of regulators by misrepresenting the veracity of their products' labels. Accordingly, FDUTPA's safe harbor provision does not immunize Defendant's deceptive labeling.

105. Plaintiffs in instant action are suing for conduct that violates the TTB and FDCA, thus Plaintiffs' claims are not preempted. However, Plaintiffs are not suing *because* Defendants' conduct violates the TTB or FDCA. Plaintiffs allege that Defendants' conduct violates Louisiana state law and Plaintiffs' claims do not exist "solely by virtue of the TTB or FDCA." Plaintiffs' state law claims do not obstruct federal regulation of alcohol product labeling.

106. Plaintiffs, on behalf of themselves, and all others similarly situated, seek restitution and disgorgement of all money obtained from Plaintiffs and the members of the Class collected as a result of unfair competitions, an injunction prohibiting Defendant from containing such practices, corrective advertising, including providing notification of the product's health risks, and all other relief this Court deems appropriate, consistent with Louisiana Deceptive and Unfair Trade Practices Act.

## COUNT II
### Violation of the Magnuson-Moss Warranty Act
### 15 U.S.C. §§ 2301 et seq.
### (Entire Class)

107.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

108.     Plaintiffs bring this Count on behalf of the Nationwide Class ("Class," for the purposes of this Count).

109.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

110.     Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

111.     Defendants are "supplier[s]" and "warrantor[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

112.     The defective wines are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

113.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

114.     Defendants express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Defective Wine's implied warranties are covered under 15 U.S.C. § 2301(7).

115.     Defendants breached these warranties as described in more detail above. Without limitation, the Defective Wines share a common design defect in that they contain abnormally high levels of arsenic.

116. Plaintiff and each of the other Class members have had sufficient direct dealings with either Defendants or its agents (retailers) to establish privity of contract between Defendants, on the one hand, and Plaintiffs and each of the other Class members, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Defendants and its retailers, and specifically, of Defendants implied warranties. The retailers were not intended to be the ultimate consumers of the Defective Wines and have no rights under the warranty agreements provided with the Defective Wines; the warranty agreements were designed for and intended to benefit the consumers only. Finally, privity is also not required because the Defective Wines are dangerous instrumentalities due to the aforementioned defects and nonconformities.

117. Affording Defendants a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Defective Wine, Defendants knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Defective Wines' safety, but nonetheless failed to rectify the situation and/or disclose the defective condition. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

118. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiff, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their Wines, in an amount to be proven at trial.

## COUNT III
### Redhibition
### (Louisiana Class Only)

119. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint. The Defective Wines contain a vice or defect which renders them useless or their use so inconvenient that buyers would not have purchased the wine.

120. Defendants designed, manufactured, sold and distributed the Defective Wines which Defendants placed into the stream of commerce. Under Louisiana law, the seller warrants the buyer against redhibitory defects, or vices, in the thing sold. La. C.C. art. 2520. The Defective Wines possess a redhibitory defect because they were not designed, manufactured, sold and distributed in accordance with industry standards and/or are unreasonably dangerous, as described above, which renders the Defective Wines useless or their use so inconvenient that it must be presumed that a buyer would not have bought the Defective Wines had they known of the defect. Pursuant to La. C.C. art. 2520, Plaintiffs and Class Members are entitled to damages and/or to obtain rescission of the sale of the Defective Wines.

121. The Defective Wines alternatively possess a redhibitory defect because the Wines were not designed, manufactured, sold and distributed in accordance with industry standards and/or are unreasonably dangerous, as described above, which diminishes the value of the Defective Wines so that it must be presumed that a buyer would still have bought them but for a lesser price.

122. Defendants are liable as bad faith sellers for selling the Defective Wines with knowledge of the defect, and thus, are liable to Plaintiffs and Class Members for the price of the Defective Wines, with interest from the purchase date, as well as reasonable expenses occasioned by the sale of the subject product, and attorneys' fees. As the manufacturer of the

defective wines , under Louisiana law, Defendants are deemed to know that the wines possessed a redhibitory defect. La. C.C. art. 2545.

## COUNT IV
## NEGLIGENCE

123.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 93 above as if fully set forth herein.

124.    Defendants had a duty to represent their product accurately.  Defendants breached that duty by negligently making misrepresentations of fact and omissions of material fact to Plaintiffs and the other Class members about their wine products.

125.    Defendants failed to label or advertise their wine products in a lawful manner and violated their duties owed to consumers by purposefully or negligently engaging in the deceptive conduct described herein with the intent to deceive Plaintiffs, and consumers similarly situated.

126.    Plaintiffs and the other Class members, as a direct and proximate cause of Defendants' breach of their duties, were damaged by receiving a worthless product, or at the very least, a misbranded deceptively labeled product, by justifiably relying on Defendants' material misrepresentation that their wine was safe for consumption or material omission about the arsenic levels of their wine.

127.    Plaintiffs suffered an 'injury in fact' because Plaintiffs' money was taken by Defendants' as a result of Defendants' material omissions and false claims set forth herein.

128.    As described above, Defendants' actions violated a number of express statutory provisions designed to protect Plaintiffs and the Class.

129.    Defendants' illegal actions constitute negligence *per se*.

130.    Moreover, the statutory food labeling and misbranding provisions violated by Defendants are strict liability provisions.

131.     By reason of the foregoing, Plaintiffs and the other Class members have suffered damages in an amount to be determined at trial.

## COUNT V
## UNJUST ENRICHMENT

132.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 93 above as if fully set forth herein.

133.     As a result of Defendants' fraudulent and misleading labeling, advertising, marketing, and sales of Defendants' Defendants' wine, Defendants was unjustly enriched at the expense of Plaintiffs and the Class.

134.     Defendants sold Defendants' wine to Plaintiffs and the Class which was a product that was illegally sold, illegally misbranded, and had no economic value.

135.     It would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits it received from Plaintiffs and the Class in light of the fact that the product was not what Defendants purported them to be.

136.     Thus, it would be unjust and inequitable for Defendants to retain the benefit without restitution to Plaintiffs and the Class of all monies paid to Defendants for the wine product at issue.

137.     As a direct and proximate result of Defendants' actions, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated persons, pray for judgment against Defendants as follows:

A.     Declaring that this action may be maintained as a class action pursuant to Federal

Rules of Civil Procedure, Rule 23, and for an order certifying this case as a class action and appointing Plaintiffs as Class representatives;

B.      Declaring that the Defendants' practice of advertising and selling wine with high levels of Arsenic, was wrongful and unfair;

C.      Restitution of all purchases of wine by Plaintiffs and the Class, in an amount to be determined at trial;

D.      Disgorgement of the ill-gotten gains derived by the Defendants from their misconduct;

E.      Actual damages in an amount according to proof;

F.      Punitive damages;

G.      Compensatory damages caused by the Defendants' unfair or deceptive practices; along with exemplary damages to Plaintiffs and each Class member for each violation;

H.      A permanent injunction requiring the Defendants to cease selling wine that contains high levels of Arsenic;

I.      Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

J.      An order awarding Plaintiffs and the Class their attorney's fees and costs and expenses incurred in connection with this action; and

M.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: March 23, 2015                     Respectfully submitted,

**Becnel Law Firm, LLC**

<u>By: /s/ Daniel E. Becnel, Jr.</u>
Daniel E. Becnel, Jr.(2926)
Matthew Moreland (24567)
Salvadore Christina, Jr. (27198)
P.O. Drawer H
Reserve, LA 70084
Telephone: 985.536.1186
Facsimile: 985.536.6446
dbecnel@becnellaw.com
mmoreland@becnellaw.com
schristina@becnellaw.com

*Attorney for Plaintiffs*